Please call for action. For argument, action, I vote. That is Enbridge Pipelines v. Murfin. Council, whenever you're ready, you may proceed. Good morning, Your Honor. Tom Furr for Dr. Murfin, Council. The matter has been abundantly brief with a lot of paper. I'm going to try to catch you up this morning on some of the backlog. There are a few points I would like to stress. Landowners argue that they have not been allowed to testify as to the value of the damage to the remainder. This was a condemnation case where a pipeline company was going to go through and take some land for a proposed pipeline project. The landowners believe, pursuant to Hartford, the Fifth District case, that they are qualified as a landowner to express their opinion on the value of the property, including the damage to the remainder. Any dispute about their credibility or whether they're qualified should go to the weight of the testimony for the jury. The court limited Dr. Murfin's testimony as to certain matters of the value of the damage to the remainder. We think that's an error. I'd like to get something straight here. Are we talking about now the trial? Yes. Because I found now we, this is the fifth case involving this or the sixth? I found five, four other cases in this pipeline issue. In this district? Not in this district. No. Fourth district, four cases. Yeah. Where it's been litigated ad nauseum about who's got the rights to what and the ICC and all of that. So I see, though, in some of your issues that you raise some of the same things that have been raised before. So what I'm trying to figure out when I look at this case, are we now talking about the trial? Well, I was trying to bring up what I believe to be the major points I had. My last point was on that issue. For example, certificate of good standing. Yeah. That's been litigated. Okay. Well, that's correct. And the fourth district ruled on that. And the fourth district made a determination that they were properly granted a certificate of good standing. But Dr. Murfin, the defendant in this case, he didn't participate in that case, and his property rights were not an issue in that particular case. But the certificate of standing that was found to be valid in the fourth district was in the same preceding number. That's correct. As in this one. That's correct. So why is that not the law of this case? Well, because this case isn't bound by the fourth district opinion, and we believe, with all due respect, that the fourth district made a wrong decision in that case. For example, what they proposed initially was a project that was a 36-inch diameter pipeline to carry Canadian crews. They switched after a delay of three or four years and decided instead to change the project and primarily bring petroleum from the Dakotas for a completely different type of petroleum, I might add, down to Patoka. Didn't they amend their application? They did amend. And we sought to say, we want to challenge that, whether there is or isn't a need for this new project, which everybody agreed happened. But at the ICC level, the ICC of the fourth district said, no, the ICC didn't have to reopen testimony, didn't have to reconsider the fact that they changed the project. Right. That's been litigated. That issue has been litigated. And you think it was wrong? I do think it was wrong. Okay. I'm really just trying to understand the scope of what we're to consider. Well, you're here for an eminent domain proceed. No, I mean, are we reconsidering the fourth district's rulings? Are we looking at lay witnesses versus how far they can testify? Only the eminent domain action of Dr. Murfin's property. That's what I would perceive. I don't think we're limited to challenging that. And we've got it in the briefs. But I think primarily you're here for Dr. Murfin's property. Okay. Now, under the law, I'll just jump in, Dr. Murfin is allowed to challenge whether or not what the ICC had proposed and what Emerson proposed at the ICC was in fact valid. And you do that through the Traverse Motion. You raise your hand and you say, I am a landowner. They want to take my land. The Illinois Constitution and the U.S. Constitution says you can't do that without just compensation. And I challenge, I challenge as a landowner whether they should be doing this because I want to challenge public use. I don't think it's a public benefit. And I challenge that. And Dr. Murfin is not prohibited from challenging that. In fact, there's abundance of case law that says just because the ICC reviewed an application and said go ahead, the landowner, his rights are only at risk in the eminent domain proceeding or the condemnation proceeding, and he raises his hand. Now, the trial court treated that more like a 2619 motion to dismiss. And there is a, we briefed all of this, that there's an abundance of case law that says it's really an evidentiary hearing where the parties testify and before that you have a right to discover. You have a right to discover materials. And not just materials that the other side wants to give you, but you have the right to submit requests for discovery and discover, for example, is this really a project that is of public use? And we challenge that. We say no, it isn't, but our requests for discovery were denied for that. Well, the argument made by the other side is that you had been allowed discovery and had asked for several continuances to allow for discovery. And that there was no supplementation. Were you allowed discovery or were you not allowed discovery? We were not given the discovery that we sought. No, no. You were allowed to conduct the discovery. Limited discovery. So when you said that you weren't allowed discovery, that's not exactly correct. We were granted certain discovery, but we weren't given, the thing that we needed was we needed to challenge is this primarily for the benefit, use, and enjoyment of the public? And we weren't allowed to challenge that. Well, that had already been decided by the court. No, Your Honor, that's not correct. Okay. The landowner is always allowed in a traverse to challenge that. But another separate landowner had challenged that, the 4th District in a different county. No, in fact, in the 4th District, we're on remand right now because the 4th District remanded the case back in Livingston County because we didn't get discovery. But we're on, we're back in the trial. So that case that was remanded, that was the Enbridge versus Kirk, is that right? That's correct. And that was, that one, my other party briefed that because the decision came up after the briefs were filed in this case? That's correct. How do you distinguish that from this, or do you find any distinction? I don't. I don't. I think we are entitled to discovery. You can't handcuff a landowner. When a big pipeline company wants to come in and build a project, they can disagree with the landowner that, well, you know, we think it's public use, but the landowner has the right to challenge it. And that's why we're on remand in Kirk because we weren't allowed to do that. Now, they're going to say, well, we gave them the ICC brief. We gave them thousands of pages. They gave us what they submitted in the ICC. But that has no relevance to the real challenge. The real challenge was, wait a minute, this is a project that Marathon had bought into at 35% in the primary shippers' marathon. And we briefed that, and we said, this is a sham proceed. That's really what it is. Was that contention about Marathon contradicted or denied by the petroleum company? Well, they said we don't get any discovery. No, that's not what I asked. Was that contention denied that Marathon was in the position you allege they were in in this transaction? No. Marathon started this whole condemnation procedure. No. Okay. It wasn't. In fact, there were two shippers. Then what else are you looking for in your discovery? Well, we want to know. Their argument is, well, the mere fact that Marathon is a 35% offer and they're going to be the primary in Seoul, what they call the anchor shipper, that doesn't make it not a public project. And we say it does, but what we really want to do is we wanted to see the documents. We wanted to see the paperwork. And then they also said, and there's a second shipper, but we won't name him, and we won't tell you who it is, and we don't know exactly how much you're going to ship. And we said that's exactly what we want to see because we want to challenge if this is really just a sham proceeding where Marathon is proposing a pipeline and it's going to ship all of its project through here and you've just taken the landowner's property based on public use when it's really a private project. Well, okay, you've got the pipeline company. Yes, Enbridge. Enbridge. You've got Enbridge saying, yes, Marathon's our anchor shipper. We've got another one that for proprietary business reasons we're not going to disclose. They're secondary. Our anchor is Marathon. That's not in dispute. Given that, without having seen the underlying documents that establish that, given that, at what point or did you at any point litigate the question, based on all of that, that this, in fact, is not an appropriate action to underline an action for eminent domain? That hasn't been litigated. Why not? Because you've got the basic information. You've got the standing of the private parties. You've got the ICC granting whatever scope of authority they granted to the pipeline company. You've got it set up for litigation of the question, why wasn't it litigated at that point when you had all of that information and those admissions? We did challenge it at the trial court. We challenged it and we lost. So you did litigate it at the trial court level? Yes. Okay. Yes. Our argument was this was a sham. And their argument is, oh, no, the ICC has already ruled on this. And they determined that it's a public use and there's a rebuttable presumption. Well, I, as the landowner. So you're basically appealing this on the merits of after all of these admissions and acknowledgements and the documents that you lost the argument on the merits in the trial court? Yes. Yes. And there's no dispute. How would discovery that you are claiming you were denied change the outcome of this litigation or the appeal on the decision of this litigation? I think it would bolster support our argument if, in fact, we think that the evidence is pretty clear. If, in fact, it is a project that is primarily for marathon, it doesn't qualify. And we don't even need that since they've admitted it. But we want to show that. We want to show here it is. Here is what the documents show. And here's what's proposed to be shipped and here is what is being shipped. And this was all a sham proceeding. That's what we want to show. By their own admission, I agree that it primarily means more than 50 percent, more than 51 percent. And it's not that. Now, their argument is marathon is part of the public. So we meet that. I say public. Now, getting back to the landowners, we talked about the landowners not being allowed to testify in this damage. And we think they should. They can disagree with it. And what if the landowner comes in and says his land is worth a million dollars? Dr. Murphy will say this, two acres is worth $2 million. That's why we have jurors. And they're free to cross-examine. And Dr. Murphy, they're free to refute his testimony. But that landowner constitutionally should have a right to walk in there and say, here is what my properties worth. Now, the other thing. Why? I mean, if that landowner has absolutely no basis upon which to reasonably give an opinion. The Harper case says the landowner is qualified merely because he is an owner of the property. There is a presumption that he is qualified to issue an opinion on that. And that's a Fifth District case. And the weight of the testimony, Harper said, is for the juror. Now, the other thing, and I have to get this clear. Did you do an offer of proof on that? What's that?  Yeah. So in the record, it's going to show up? I believe it is, yeah. Okay. I will admit, I have represented 300 people. And we've been in nine counties in the federal court. And it gets confusing for me, which was why. But I do want to stress this point, and then I'm going to sit down. You know, Dr. Murphy was denied the right to cross-examine the witnesses about the particular easement. And one of the things that we wanted to show is the ICC never granted them the right to mortgage the easement. And we argue that's a cloud on the title. We argue that so when they get up and they submit into the record the easement, but we're handcuffed from cross-examining their witnesses and their experts to say, well, now you're going to mortgage. You have the right to mortgage the easement. And we believe that that will harm the value of the property. But the trial court ruled that we were limited. We couldn't cross-examine. Notwithstanding that it's in the record and they testified about it, we couldn't bring that fact up about that Enbridge would have the right to mortgage the easement, they would have the right to perform hydrostatic testing. These were all things that even we weren't allowed to bring in the safety manual that Enbridge had that said these things can explode. And we were handcuffed. That's really our argument. Would that not have lowered the value that the jury gave you, though? No. Our argument is these things, when you put a pipeline, a high-pressure pipeline in there, and it goes back to the cases that we cited here, that when they're near a building, that's going to devalue the property. And so if Dr. Murfin has a piece of property, when that pipeline goes through and you're going to be doing these things, we wanted to argue. Now, they're going to talk about consent, and I believe that's a typo, but we certainly never said that you couldn't – we never agreed to anything about – we agreed that we won't bring in the safety manual, for example. And our argument is that is a valid concern for devaluing the property, and once this pipeline goes through, we said it's going to devalue the property. But we were barred from bringing that stuff in. But I think you just agreed with me. So the jury gives you an amount of money that's not inclusive of the devaluation. Yes. I thought you – that decreases the value. Our argument would be if we were allowed to submit that to the jury and explain, for example, well, you're going to put a mortgage on this property, the whole property, that's going to be affected, that they're going to mortgage just the easement. But our argument – and that was part of the easement, part of what's in the record, and they submitted it as exhibit number one, but we were barred from bringing that up at trial. We can't point this out to the jury that that is going to devalue the property. If they come along, which they have a right, and you're going to presume they have – they will use all their right, they're going to mortgage that. And we're going to say, wait a minute, there's a mortgage against this property, and we can never pay it off. In our argument, that will devalue the property. Your Honor, thank you for your time. Thank you, Counsel. Counsel? Thank you. May I please record, Counsel, my name is John Spezia. I'm here with Bill Groome on behalf of Illinois Extension Pipeline Company, formerly an Enbridge entity. And the court has asked good questions here this morning. I'll try to address as many of them as I can. It's our position here that the defendant's claims of error of the trial court's rulings on both the evidence at trial and associated with the traverse are not warranted by the facts, and they're not warranted by the law. I'd like to start with the evidence, and this is in this specific trial. The defendants here are challenging a verdict that is within the range of the expert testimony. There was a view of the property by the jury. The standard applicable under those circumstances is indeed an onerous one that the landowners here simply cannot satisfy. There is not a single error that is claimed in this appeal that is associated with their expert appraiser's testimony. Said differently, their expert was allowed to testify, and he gave all of the opinions that he had, which amounted to $230,905 in both damage to the remainder, and it also included $5,900 for ameasements. Instead, this appeal is based on a complaint that the landowner should have been permitted to provide wildly speculative and profoundly prejudicial testimony about explosions, leaks, spills, and danger. In the trunkline case, the owner of the Supreme Court said that a witness must have some peculiar means of forming an intelligent and correct judgment. As to the value or the effect upon it of a particular improvement, it must be beyond what is possessed by the man generally. I submit to the court there is zero foundation that was laid for Dr. Murphin, the defendant in this case, to indicate that he was qualified. There is zero foundation to indicate that he had any idea what the effect of some wildly speculative possibility of an explosion, a leak, a spill, or danger would have upon his particular property, and this is where it gets interesting. This particular pipeline, the Sachs pipeline, was the fourth pipeline on the Murphin property, which is located on something called Tank Farm Road down the road from a big crude oil tank facility. So, Justice Cates, when you asked the question earlier about lowering value, if indeed this did have some effect of lowering value, you won't have to wonder where they started with three existing pipelines in the value. Well, we know where Dr. Murphin started. He started at $1.5 million. He proved himself on voir dire that he was completely incompetent to testify. How do we know that? We know that because he blatantly violated the unit rule. Dr. Murphin was allowed to testify at trial, then he took the value of his house, which he based on what it was insured for, not a proper measure of value. He then added that to the value that he attributed to one of his garages. He then added the value of what he called the farm ground. He added then the value of a barn. Completely improper method of valuation. Dr. Murphin said there were no comparable sales that he could find, but the experts in the case testified that there were 19 comparable sales that they found. The trial court promptly barred Dr. Murphin from giving opinions on remainder damage. He was disclosed, Dr. Murphin was, and the defendants here complain on appeal that they should have been able to introduce this evidence of hydrostatic testing. Let me back you up a minute. Sure. On what basis do you contend that the trial court was correct on the specific issue of the value of damage to the remainder? Your question is why was Dr. Murphin properly barred? On that particular question, yes. Dr. Murphin had no basis for a remainder damage opinion. His value of the whole was incompetent, so he could never figure out what the value was in the after because his value of the whole of the before condition was improper. That's the first thing. The second thing is that Dr. Murphin's, the basis for his opinions of remainder damages were explosions, leaks, spills, and danger. I see. So you're linking those two. Sure. I think that they're inextricably intertwined. The basis for his remainder damage opinion was this possibility of explosion and danger he believed was associated with the pipeline, but he had no evidence that there was any impact on the market. They presented no evidence that any such leak or spill or danger or explosion occurred under similar circumstances as required by the Northern Illinois Gas v. Winerand case. He's disclosed, Dr. Murphin was, to testify about hydrostatic testing, and in his disclosure it says, quote, Dr. Murphin believes, referring to hydrostatic testing, this will likely create a stigma to the property that negatively impacts the remainder value. On Guadir, we asked Dr. Murphin, and he said he never even read the safety manual. Yet it was a disclosed basis for his opinion. It's our position here that it's very clear that Dr. Murphin did not meet any standard for reliability. His opinions had met no standards for reliability. They were properly excluded. The court asked him some questions before I move off of that. There's also a contention here that the defendant should have been able to cross-examine witnesses based on the contents of the easement and specifically based on hydrostatic testing and the ability to hydrostatically test and the right to mortgage. I would submit to the court that it's this court's decision in the Mitchell case that prohibits exactly that type of questioning on cross-examination.  The mere putting of a question which conveys to the jury improper information would be highly improper and wholly unwarranted. So the question was asked before by Justice Cates, is there an offer of proof? In fact, there is an offer of proof for Dr. Murphin. And for the first time ever in the case, in his offer of proof, Dr. Murphin says that the mortgage is something that would cause remainder damage. The right to mortgage. Notably, the defendant's own appraisal expert never relied on the right to mortgage, never relied on hydrostatic testing, and of course we know that Dr. Murphin didn't know anything about hydrostatic testing when he was asked under oath. So there is, there was no disclosed testimony that made the right to mortgage or hydrostatic testing relevant. Defendant's counsel had every opportunity... There were experts in this case on both sides? Yes. And so under 213 were the proper disclosures made where you know you give opinions back and forth? There were 213 disclosures that were exchanged among the parties. However, Appraiser McCann, who testified with the defendants, was not disclosed to testify that the right to mortgage had any impact on value, property value, nor was he disclosed to testify that hydrostatic testing or the existence of a safety manual had any impact on value. In addition, when he testified on direct examination, he mentioned neither of those factors in connection with his value opinions, nor was an offer of proof made for Appraiser McCann that would have established the relevance of either hydrostatic testing or the right to mortgage. Defendant's counsel also had the opportunity to make an offer of proof with IEPC's appraisal experts, Appraiser Lunte and Appraiser Bates, and no offer of proof was made for either of them that would indicate that right to mortgage or hydrostatic testing was relevant. The low bar that the defendant suggests that exists for landowners does not exist in Illinois at all. In order to testify in any case, a witness has to be qualified and the proper foundation has to be made. It just wasn't done here, and the trial court properly barred Dr. Mervyn's opinions of remainder damage. Frankly, the trial court had every reason to bar Dr. Mervyn's opinion of the value of the whole for his blatant violation of the Union Rule. The second category of error that is claimed here on appeal deals with the Traverse Proceedings. I'd like to start with this. There's an allegation that there was a lack of good faith negotiations, and the defendants had every opportunity at the Traverse to present evidence of a lack of good faith negotiations, and they couldn't do it, and they can't do it, because the evidence here is overwhelming that there were substantial negotiations and that Illinois Extension Pipeline Company acted in good faith. There were a total of six offers and demands that were exchanged between the parties. Defendants at one point acknowledged that they rejected an offer of $36,800 an acre for the permanent easement and $18,400 an acre for the temporary easement, the equivalent of $138,000 for an underground pipeline easement co-located with three existing pipelines. And that was on the 2.88 or 99 acres, whatever, almost three acres. That's right. So it was 2.2 acres of permanent easement and then 2.99 acres of temporary construction easement. The verdict came in at less than half of that offer, and I would submit to you that, if anything, the facts here show that there was not bad faith. They simply overplayed their hand when they were negotiating. They alleged that 10 days was an insufficient amount of time for the final offer, yet they ignored that the first offer went back to September of 2012. This wasn't a 10-day negotiation. The first contact with the Murphans was in March of 2007. There was an offer made in September of 2012, another offer made in April of 2013, another in May of 2014, and then they alleged this last offer of the $36,800 and $18,400. Even if there were only 10 days, the Forest Preserve case of the Illinois Supreme Court indicates that 10 days is an insufficient amount of time. The defendants talk about not having any idea of what the basis of the offer was. This issue was litigated in the eminent domain portion of the Illinois Powers Commission, Proceedings 13-0446. Let me ask you about their claim for discovery, because that seems to be a big issue for them. What is the issue that you're not giving your companies, not giving them the appropriate documents that they want? And that we have another case, obviously, where it's been remanded for discovery. Sure. And this also goes back to a question that was asked here by Justice Barberis. So the Kurth case is the Livingston County case that the 4th District Appellate Court has remanded. The distinguishing factor in the Kurth case is that there was not seven months of discovery. On the issue of the traverse. That's the issue in the Kurth case. Here, the trial court allowed seven months for the defendants to do discovery. Justice Goldner asks a good question, and that question is, what would discovery have established about the role of Marathon in this project? And the answer is nothing they didn't know already. And I'm interested if counsel is going to stand up back up here and act like he didn't know exactly what Marathon's role in the project was, because under seal at the Illinois Commerce Commission, they cross-examined witnesses, and they know exactly what the barrels per day were committed to by Marathon. So... Same parties. Same... So the defendants here, I want to be clear about this, the defendants here appeared, filed an appearance in 13-0446. That was the eminent domain portion of the Illinois Commerce Commission proceedings. The appearance that they filed, and it's in the record, I believe we indicated in the photo. The appearance has only that cap shot. However, I submit to the court that it's very clear that their attorney and their privies were litigating all along in 07-0446, which started in 2007, culminated in what we call the Intervenors 1 decision in 2010, and then was reopened to address this issue of both Marathon's investment and its sharing commitment. So when you talked about they, the dubious they, were allowed to cross-examine and received facts under seal, I'm trying to find out who the they were. Okay. Well, it's two different proceedings. The cross-examination that occurred of appraiser Bates and IDPC's representative John Kay in December of 2013, that was in the 13-0446 proceeding. And is that where they got information about barrels per day, et cetera? The barrels per day information would have been in the reopened 07-0446 proceedings. So when I say that they know what the barrels per day are, I'm talking about their counsel, attorney clerk. I'll also point this out. But not the same, so you got the same lawyer, but not the same party. That's correct. However, I believe that the record here will show that in his offer of proof for a witness known as Carlisle Kelly. I'm sorry? Carlisle. Carlisle Kelly was a witness who was present at the traverse hearing on March 11, 2015. I believe that the record will indicate that Mr. Kelly, strike that, counsel provided an offer of proof for Mr. Kelly. Which counsel? In this case, in Marion County. And during that offer of proof, counsel indicated the barrels per day that were being transported or committed to being transported by a marathon. So you're basically saying there's actual knowledge. Absolutely. As a bottom line. Absolutely. It's no different than their claim. Counsel came to the traverse hearing and said that Dr. Murfin had never been provided with a copy of the land market study. They cross-examined appraiser Davis about the land market study in December of 2013. It was filed with the Illinois Commerce Commission in August of 2013. It was attached to our response to the traverse that was filed. They had actual knowledge of the land market study, just like they had actual knowledge of Marathon's role in this project, both as an investor and its shipping commitment. Perhaps I misunderstood counsel's argument with regard to Marathon's position. But I thought he had stated that he was aware that Marathon would be providing a third of the oil that would be transported through the pipeline, but that there was an undisclosed other party that he was wanting that information for and that he didn't know how much was going to be transported by that person. Okay. So they had actual knowledge of the barrels per day that are being shipped by Marathon Petroleum Company pursuant to a long-term shipping commitment, number one. Number two, they have actual knowledge of the barrels per day that are being shipped by shipper number two. So that information is, I mean, at this point, I believe, in the public arena. I don't want to misconstrue or say that I thought he was saying that he didn't know that information. That second shipper. Right. And am I wrong? I don't know what he says he knows because it changes frequently. So I know what the facts are. The facts are that they know the barrels per day being shipped by Marathon and they know the barrels per day committed to by a second shipper. What they don't know is the identity of the second shipper. And I would go back to this. It's been published by the ICC on Rioli. It's published in the Intervenors 3 decision that Marathon has committed a long-term commitment to two-thirds of the pipeline's capacity. So what's the reason that we're not being allowed to know the mystery participant? That was a decision that was made by the commission. I'm sorry. That was a decision made by the commission. So the commission made the decision that the mystery participant shouldn't be revealed? Or was that on motion by you? That was on motion by Illinois Extension Pipeline Company, yes. And it was, I think, proprietary reasons. And I think it's also completely irrelevant. If I might, Justice Goldman, just have one more question. Of course. So the mystery participant, what, if any, additional value would that have to Mr. Pler's clients, in your judgment? None. Why? His argument is that Marathon is the primary shipper because it has two-thirds capacity. It's completely irrelevant what the capacity of the other shipper is. So… Does it go to the public use? It doesn't. It has nothing to do with public use. And I think the point was made earlier. The public use issue, and whether this is a private pipeline, has been litigated and re-litigated and even litigated after it was re-litigated. And the point here is that you can't just change the name of your argument. I mean, think about what's being done here. They litigated at the Fourth District Appellate Court in Interveners 3, and their argument was that the Sachs pipeline was, quote, primarily for a private purpose. And now they slap a new label on it and say it's not primarily for a public purpose and say it's a different issue. It's not a different issue. Marathon's role in this, and whether it is private or public, has been resolved. Between these parties or their privies in a court of competent jurisdiction, leave the appeal denied by the MS Supreme Court, and I'm going to sit down. Okay. Actually, may I ask one last question? Of course. Absolutely. With regard to that last argument… Yes. How does that differ, or is there a difference, between what has been remanded by the Fourth Circuit or Fourth District in the Kurth case? How is that different here? I mean, in Kurth, are they remanding because that mystery shipper's name isn't out there and that there's an issue as to whether it's public use or not? And is that the same argument that's being presented in this case? I didn't distinguish their remand from what we are being asked to do. Two things that distinguish the remand. The first is, in this case, in Marion County, that's before this court today, there was seven months of discovery. Depositions of the deposition of IEPC's appraiser, the deposition of its company representative. I know, but not disclosure of the mystery entity. Well, I would submit to the court that I'm not sure that there's a citation to the record that would even justify such a claim. Well, are they getting it in Kurth? Pardon me? No. So, Justice Barberos asked you about… Okay. Let's try to stay with his answer. I got it. What he asked me is how do you distinguish Kurth, so that's the first way to distinguish it. They're not getting the mystery entity in Kurth. That's correct. They are not getting the mystery entity in Kurth. Because the remand in Kurth was based on the four district appellate courts' reading of 735 ILCS 30-5-5-5C, the provision of the Eminent Domain Act that creates a rebuttal presumption. And it's our position that what the four district appellate court found is that there was an obvious issue that the landowners had the ability to… And the obvious issue they described is that the landowners had the ability, as to their respective properties, to show that there was no public use. What the four district also said is that the landowners were not entitled to relitigate the project itself. So, the Sachs project and the authority for the Sachs project, its public purpose, its public use, is over. That has been decided finally by the commission affirmed by the four district appellate court three times. What the four district said is that the landowners still have the ability to make an argument to rebut the rebuttable presumption in the Eminent Domain Act by providing evidence. And they're focused on the language of 5-5C, which says, evidence that, quote, the acquisition of the property for private ownership or control. So, the four district says and incurs repeatedly that the landowners have the ability to challenge as to their respective properties. For example, if you're an extension pipeline company and decided to put up a wind generating, electric generating windmill, the landowner could show that that's not for public use. Because the only approved public use here is for the conveyance of crude oil by pipeline. So, that's our position as to what's operating there. Okay. Well, then, just you mentioned in this case there were seven months of discovery allowed on the Traverse issue. And you haven't said how much was allowed in the Kurth case. There was none? As you might understand, there was no discovery time allowed or no discovery allowed in Kurth on that issue? So, in the Kurth case, the defendants were allowed to search discovery. They exchanged discovery. What happened in Kurth is that the circuit court of Livingston County in Kurth essentially deferred to the circuit court in McLean County, which held an extensive hearing on discovery requests by the landowners. And in the circuit court of McLean County, October 10, 2014, their discovery requests were considered and denied. The Kurth case came up after that discovery hearing. I think that the Traverse was November 3, 2014, in Livingston County. So, the answer to the question is they exchanged discovery. I'm sorry. When was the other hearing? October 10th in McLean County. McLean County. Right. What I see in my preparation for this hearing and one of the notes I took, a quote from the Enbridge Kurth case, was that the court found that the trial court's dismissal of landowners' Traverse motions effectively deprived landowners of exercising the option of presenting relevant evidence to, one, rebut the presumptions of public use and the public necessity that Enbridge possessed when it filed its condemnation suit. And I believe that's what they're asking here is to find out who the parties were, how much of it's for public use, and how much of it's for private use. And in the Fourth District, obviously, we know they remanded it based on that argument. Why should we not? Because their remand, if you read Kurth, their remand in Kurth is on a very narrow issue. In fact, if you look at, I believe it's paragraph 164 of the Kurth decision, you'll see that the appellate court in Kurth also struck certain portions of the Traverse. And it is paragraph 164. I think I'm doing this too much. What the court says in Kurth is, we're going to tell you what's not the proper subject of a Traverse. So here's what they say in paragraph 164. For example, the commission's grant of eminent domain authority and the allegation that it did not apply to the current SACS pipeline project is not the proper subject of a Traverse. The allegation that IEPC did not possess the legal authority to construct the SACS pipeline project, not the proper subject of a Traverse. The allegation that IEPC is not properly vested with authority to acquire these tracts of land, not the proper subject of a Traverse. The allegation that the SACS project did not constitute a common carrier because of the restrictions on access of the proposed pipeline, not the proper subject of a Traverse. So what the court makes very clear, and they do this at paragraph 161, they say, as to landowners' respective properties, Lynn and Section 5-5C of the Act permitted landowners to present relevant evidence to rebut the presumptions. That's as to their respective properties, not as to the SACS project as a whole. That's the problem, is that the discovery here that if they're looking for the name of the second shipper, we're back to them challenging the entire project. And those issues were resolved by the commission and the 4th District. Thank you very much. Thank you. Counsel? Mr. Sconehurst, will you allow extra time? Absolutely. Sure. I really won't be long. We won't hold you to that. I'm happy to answer any questions. What many of you who may not be in this court know is the 4th District has also ordered parties in the appeals in DeWitt County and McLean County to address the issue based on their ruling in court why the 4th District shouldn't rule the exact same way in McLean and DeWitt and remain to allow discovery. That's what's going on. Now, they have a different interpretation of why the 4th District remanded and said you get discovery and whatnot. We respectfully disagree. And they're caught up about, you know, if the project is not for public use, then it's not for public use. Let me stop you for a moment. A public use as the project as a whole or a public use as your opposing counsel posed the 4th District decision, a public use as to the particular landowner who is affected? Either. Either. When does the ICC decision finally end being litigated? Well, it would be over when, in fact, the landowners challenged through their rebuttable presumption that there is a rebuttable presumption. Everybody agrees with that, that once the ICC grants that certificate, landowners can rebut that. And when they don't rebut it, then they fail. It's over. It's done. And when they're caught up about the public use as a project as a whole or public use on the property, what the ICC did was to say, well, here, we're going to read your papers, Cambridge, and we are going to, based on your application, we're going to say this meets the public use. But if, in fact, the landowners can get discovery and say, this was all a sham, this was never, this was a procedure to make it appear like a public use project, and here is the evidence, then they lose it. Because it's only a presumption of public use which the landowners could challenge. And that is why we needed this discovery, and that's why we're going back in Livingston and likely McLean and Newham. But in this case, in this case in particular, we're here on the traverse issue with regard to the eminent domain after the ICC has already ruled. And we don't typically go back and challenge the ICC because the ICC has the expertise granted by the legislature, so we're not going to decide whether or not the ICC's ruling was correct in regard to is it a public use. But for the traverse action and the eminent domain that you have raised for this particular case, we can do that in so much as 100% correct. You're not going in right now and second guessing, or is it even part of the record, what they submitted at the ICC. That's not the purpose of this. That's why we have the ICC. We're challenging whether, in fact, one thing is what they told the ICC is actually what's occurring. And I just, I give a, throw out a real crazy argument. Let's say that we got the records and the documents and it turned out that the country of China is pushing petroleum through that pipeline on the barges down in the Gulf and onto China. Okay. We would say that's not a public use. And we say we have the right to do that. Well, let me ask you this. Yeah. In your conception, what is a public use? Well, it says under the eminent domain act that the project has to be primarily for the benefit and use and enjoyment of the public. And that means, for example, that it would have to be primarily for the public. Now, they spend a lot of time on the common carrier pipeline. Those are two separate things, whether they're a common carrier or whether they claim they're a common carrier and whether or not they qualify for eminent domain. Because it's primarily for the public. Like, primarily for selling power on an electrical wire would be primarily for the public. A highway, if the IDTO, the INDOT comes in and says, we need to take the highways, then? Well, under your definition, a pipeline could never be for public use. Because neither I nor my neighbors are in the habit of tapping into a pipeline to get crude oil. No, that's not correct, Your Honor. There are plenty of companies out there that say need to ship on that pipeline. And they need space on the pipeline. But that's not what this project is. This project is marijuana. And it is shipping its project on its pipeline to its refinery in Ohio and Indiana to make gasoline for its companies. Thank you. Hey, don't sit down. I'm sorry. I thought she hit me. I thought she hit you the extra time. All right. So I would like to know what relief you want from the court. You have a trial. So at this point in time, as we sit here, you're asking us to reverse the findings of a jury based on error of the trial court. Yes? Yes. I mean, this whole discovery issue, I don't know how that's before us because you already went to trial. You didn't ask for an interlocutor. I mean, I don't know how we get there. In every trial, we ask for interlocutory appeals. And I can't remember if I did here or not. How do we get to your discovery issues? You've raised all these areas in trial. I mean, it's very odd because in, for example, the other cases in Vermillion and Eloise County, the same thing happened. And it's almost like, oh, give me this discovery. Go on back. Remand it down. I know we had a trial here. But then we'll find him guilty. And what I mean by that is, okay, trial court, you got to give me some discovery. Then trial court, you rule on it. And then we'll decide. And if you decide, because the court has, if you read that court decision, great deference, then it would be, the traverse would be over. And then we would move into whether or not the trial court made any evidentiary rulings or any problems that are appealable at the trial end. So I don't think we weighed that, meaning we never did weigh the traverse issues. But if we get to the, what do we want from a retrial? We want the ability to say, mortgaging the easement should have come in. That adversely affects it. Under trunkline, pipeline explosions, as the Supreme Court said, it would be very relevant if it's near homes or whatnot. But in trunkline, he was out in the middle of the field. Well, that's not what we have with Dr. Murphy's property. He got a big old million-dollar house. And our argument is we should have been able to present that to the jury. The reason there was no testimony was we were barred from that. And if we say, well, this is the reason, then they're going to say we relied on improper elements for establishing value. So that's why our expert couldn't say that, because if he does, they're going to argue he relied on improper elements. What we want is a retrial. We don't think we can. So you want us to set aside the jury's verdict? That's correct. And you want us to do that based upon the court's abuse of discretion in the motions in limine? Yes. And? Tell me. And? We want discovery. Of what? Discovery on what? We want discovery. Wait, wait. Excuse me. So once we set aside the verdict, that's when you want us to further order discovery on what? Do you have a pleading out there that the court denied or an objection that was ruled on? Very similar to what the four districts had is we want discovery on what? But have you filed a request for production, an erogatory, something in the record? Yeah. Right. I don't have the record. So in the record that's out there, there is going to be an objection that's been overruled or sustained that you want us to? Yeah. And all we really have is from Enbridge that occurred at the ICC. There was a comment about, well, Laura was there. Yeah. We have somebody testifying that, yeah, that's what's going to happen, and we can't tell you who the other guy is. And the reason I think they don't, I don't believe there is another guy, but we have the right to know that. The challenge? Well, with the right to cross-examine the witnesses, I believe Enbridge is arguing that you failed to preserve that in the post-trial motion. Do you recall what the ruling was at the trial court on your objection at trial in that regard and why it's not in the post-trial motion, or is it? I thought it was, but I will – I thought it was. I thought we had made offers of proof. I don't recall. Any other questions? Thank you. Your Honor, I don't think so. We've reached our limit on that. I appreciate the briefs and arguments of counsel. We appreciate the briefs. We'll take the case under advisement.